## In re KEITHLEY INSTRUMENTS, INC., DERIVATIVE LITIGATION

**This Document Relates To: All Actions.**

**Case No. 1:06CV2171.**

United States District Court, N.D. Ohio, Eastern Division.

March 21, 2008.

David H. Kistenbroker, Michael J. Summerhill, Joni S. Jacobsen, Katten Muchin Rosenman, Chicago, IL, John D. Parker, Michael J. Montgomery, Baker & Hostetler, Mitchell G. Blair, Fritz E. Berckmueller, Calfee, Halter & Griswold, Cleveland, OH, for Defendants.

## MEMORANDUM OPINION AND ORDER

SARA LIOI, District Judge.

This is a shareholders' derivative action. Before the Court are two motions to dismiss Plaintiffs' Second [1] Amended Consolidated Shareholder Derivative Complaint (Doc. No. 23) (the "Complaint"). On April 27, 2007, Defendants Brian Bachman, James Bartlett, Philip Estler, Allan Gaffney, James Griswold, Hermann Hamm,

---

1. Although the Complaint is styled simply as an "amended" complaint, it is actually the second amended complaint. The first amended complaint was filed November 13, 2006. (Doc. No. 7.)

Leon Hendrix, Jr., Mark Hoersten, Frederick Hume, Joseph Keithley, David Patricy, John Pesec, Mark Plush, Linda Rae, Ronald Rebner, N. Mohan Reddy, Gabriel Rosica, Terence Sheridan, Sherman Willows, and R. Elton White (collectively, the "Individual Defendants") filed a motion to dismiss. (Doc. No. 28.) Also on April 27, 2007, nominal defendant Keithley Instruments, Inc., ("KEI") filed its own motion to dismiss. (Doc. No. 32.)[2] Both the Individual Defendants and KEI seek dismissal pursuant to Federal Rules of Civil Procedure 12(b)(6) and 23.1 based on Plaintiffs' failure to make a pre-litigation demand on KEI's board of directors (the "Board") and Plaintiffs' failure to plead particularized facts showing that demand was excused as futile. Individual Defendants also seek dismissal on the grounds that Plaintiffs' substantive claims are barred by the applicable statutes of repose, are insufficient as a matter of law, and/or fail to satisfy applicable pleading standards. Plaintiffs filed separate opposition to each motion. (Doc. Nos. 36 & 38). Both the Individual Defendants and KEI filed replies. (Doc. Nos. 41 & 42.)[3]

## I. Statement of Facts and Procedural Background

Plaintiff Michael C. Miller filed the initial complaint in this matter on August 15, 2006, in the Court of Common Pleas of Cuyahoga County, Ohio.[4] Defendants removed the matter to this court on September 8, 2006, invoking federal question jurisdiction. (Doc. No. 1.) The Court consolidated this matter with three other actions under the caption of the instant case.[5] (Doc. No. 33.)

This consolidated derivative action arises from allegations that directors and officers of KEI manipulated[6] stock option grants. A brief primer on the practices encompassed by the term "manipulated," courtesy of the Delaware Court of Chancery, is instructive:

> Stock options "backdating" is a practice whereby a public company issues options on a particular date while falsely recording that the options were issued on an earlier date when the company's stock was trading at a lower price. The options are purportedly issued with an exercise price equal to the market price on the date of the option grant. But, in fact, because the grant dates were falsified, the options were "in the money" when granted. The practice of "spring loading" stock options involves making market-value options grants at a time when the company possesses, but has not yet released, favorable, material non-public information that will likely increase the stock price when disclosed. Conversely, "bullet-dodging" options are

---

2. KEI's motion to dismiss simply adopts and incorporates section I of the motion to dismiss filed by Individual Defendants.

3. The reply brief filed by KEI merely adopts and incorporates section I of the reply brief filed by the individual defendants.

4. The first derivative action was filed by plaintiff Nathan Diamond six days earlier, on August 9, 2006. That action was consolidated under the caption of this case, along with two others. Diamond subsequently was dismissed as a party pursuant to his request. (Doc. No. 73.)

5. In addition to Miller, the other named plaintiffs are Ralph Aquaro, Diamond, Edward P. Henry and Mike Marks.

6. Plaintiffs' Complaint alleges that Defendants engaged in several different fraudulent practices regarding the issuance of stock options. These practices fall generally into three categories: "backdating," "spring loading" and "bullet dodging." The Court refers to these practices, in the collective, as options "manipulation."

granted just after the company releases negative information to the market thereby allowing the recipient the benefit of a lower exercise price that reflects the price decline caused by the negative information.

*Desimone v. Barrows,* 924 A.2d 908, 918 (Del.Ch.2007) (citations omitted).

The Complaint raises federal law claims under Sections 10(b), 14(a), and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78 *et seq.,* (the "Exchange Act"), as well as a variety of state law claims. The named Plaintiffs are, and at relevant times have been, shareholders of KEI. (Compl. ¶ 13.) KEI is an Ohio corporation engaged in the design, development, and manufacture of electronic testing and measuring equipment. (Compl. ¶ 14.) The Individual Defendants all are current or former directors and/or officers of KEI. Defendants Bachman, Bartlett, Griswold, Hendrix, Keithley, Reddy and White are current members of KEI's Board. Defendants Estler, Gaffney, Hamm, Hoersten, Hume, Keithley, Patricy, Pesec, Plush, Rae, Rebner, Rosica, Sheridan and Willows are, or were, KEI officers, each of whom is alleged to have received options to purchase KEI shares. Specific allegations regarding each of the Individual Defendants are as follows:

## A. Directors

Defendant Bachman has served as a director since 1996, as a member of the Board's Compensation Committee since 1997, and previously served on the Board's Audit Committee from 2000 to 2001. (Compl. ¶ 16.) Defendant Bartlett has served as a director since 1983, on the Compensation Committee from 1995 to 1997 and from 2005 to the present, and on the Audit Committee since 1998. (Compl. ¶ 17.) Defendant Griswold has served as a director since 1989, on the Compensation Committee from 1996 to 2001, and on the Audit Committee from 1995 to 2001. (Compl. ¶ 18.) Defendant Hendrix has served as a director since 1990, on the Compensation Committee since 1998, and on the Audit Committee from 1995 to 1997. (Compl. ¶ 19.) Defendant Keithley has served as the Board's Chairman since 1991. He has never served on the Compensation Committee. (Compl. ¶ 15.) Defendant Reddy has served as a director since 2001, and on the Compensation Committee from 2002 to 2004. (Compl. ¶ 20.) Defendant White has served as a director since 1994, on the Compensation Committee from 1995 to 2004, and on the Audit Committee from 1998 to 2004. (Compl. ¶ 21.) With the exception of Keithley, none of the current directors is alleged to have received any options. Defendants Bachman, Bartlett, Griswold, Hendrix, Keithley, Reddy and White are referred to collectively as the "Director Defendants." The table below illustrates the dates of board and committee service for each of the relevant directors.

| Board Member | Director | Compensation Committee | Audit Committee |
|---|---|---|---|
| Bachman | 1996–present | 1997–present | 2000–2001 |
| Bartlett | 1983–present | 1995–1997, 2005–present | 1998–present |
| Griswold | 1989–present | 1996–2001 | 1995–2001 |
| Hendrix | 1990–present | 1998–present | 1995–1997 |
| Keithley | 1991–present | | |
| Reddy | 2001–present | 2002–2004 | |
| White | 1994–present | 1995–2004 | 1998–2004 |

884

## B. Officers

Defendants Estler, Gaffney, Hamm, Hoersten, Hume, Keithley, Patricy, Pesec, Plush, Rae, Rebner, Rosica, Sheridan and Willows are current or former KEI officers. Each is alleged to have received manipulated options to purchase KEI shares. Of note, Defendant Keithley, KEI's President and CEO at all times relevant hereto, allegedly received at least 320,000 manipulated stock options. Keithley exercised these options, and the shares he acquired as a result were among the 3,400,000 shares he sold during the relevant time period. (Compl. ¶ 15.) These defendants are referred to collectively as the "Option Recipient Defendants."

## C. The Option Grants

The allegedly manipulated stock option grants were approved pursuant to KEI's two stock option plans, the 1992 Stock Incentive Plan and the 2002 Stock Incentive Plan (the "Plans"). The Plans were approved by shareholders. (Compl. ¶ 49.) Both Plans provided that the price of any options granted was to be not less than 100% of the fair market value on the date of the grant. (Compl. ¶ 50–51.) The Plans also specifically delegated authority for their administration to the Compensation Committee. (Compl. ¶ 53.) KEI provided stock options to certain key executives on an annual basis as part of its compensation plan. In the Complaint, Plaintiffs identified eight of those annual grants (each year from 1995 to 2002) as

subjects of alleged manipulation.[7] Those eight grants encompass approximately 2.28 million shares. (Compl. ¶ 2.) According to Plaintiffs, these eight grants were made on dates on which KEI's stock was trading at or near its lowest price of the relevant fiscal quarter and/or fiscal year. (*Id.*) Since 1997, KEI has tracked all option grants using computer software known as "Equity Edge." (Compl. ¶ 60.)

On September 9, 1995, defendants Hamm, Hume, Keithley, Rebner and Sheridan allegedly received option grants at an exercise price[8] of $6.84 per share. According to Plaintiffs, these grants occurred after a significant drop in the share price, and just before a sharp rebound. Plaintiffs allege that these grants initially were approved by the Compensation Committee on July 6, 1995, but were not approved by the full Board until September 9, 1995. (Compl. ¶ 62–63.)

On September 7, 1996, defendants Hamm, Hume, Keithley, Rosica and Rebner received option grants at an exercise price of $4.63 per share. Plaintiffs allege that the timing of these grants coincided with one of the lowest closing prices of KEI stock during the 1996 fiscal year. (Compl. ¶ 64.) The Compensation Committee purportedly approved the 1996 grants on August 22, 1996, and the full Board gave its approval on September 7, 1996. (Compl. ¶ 65.)

The 1997 grants to Hoersten, Keithley, Rebner and Rosica are dated September 19, 1997, and were issued at a price of

7. In the Complaint, Plaintiffs also allude to the issuance of "off-cycle" or discretionary option grants, which are distinguishable from the annual grants. Plaintiffs claim that these discretionary grants "technically" were not authorized by the Plans. (Compl. ¶ 56.) However, the off-cycle grants are mentioned only in passing in a single paragraph, and it is

clear that Plaintiffs do not base any of their federal securities law claims on these grants.

8. The terms "exercise price" and "strike price" are used interchangeably to mean the price for which a security will be bought or sold under an option contract if the option is exercised. Black's Law Dictionary (8th ed. 2004).

$5.72 per share. The Compensation Committee approved the grants on July 18, 1997, and the full Board followed suit on September 19, 1997. According to Plaintiffs, the price of KEI stock had increased by 8.21 % approximately ten trading days after the grant. (Compl. ¶ 66–67.)

In 1998, Hoersten, Keithley, Patricy, Plush, Rae and Rosica received option grants at a price of $2.53. These grants passed the Compensation Committee on July 17, 1998, and received Board approval on September 11, 1998. Plaintiffs contend that the strike price of the 1998 grants coincided with one of the lowest closing prices of the year. Plaintiffs characterize this grant as a "bullet dodging" tactic, by which the option recipient defendants allegedly saved a collective $184,475. (Compl. ¶¶ 68–69.)

The 1999 grants to Gaffney, Hoersten, Keithley, Patricy, Plush, Rae, Rosica and Willows were dated July 16, 1999, and carried a strike price of $4.13. According to Plaintiffs, the closing price on July 16, the purported date of the grant, was actually $4.22. The $4.13 price was the closing price on July 19, 1999. This discrepancy was explained as an error by someone identified as Ms. Best in erroneously entering the required information concerning the option grants into the Equity Edge software system. Plaintiffs contend that, following the 1999 grant, KEI stock rose by 72% by the end of the fiscal quarter (approximately two months later). (Compl. ¶¶ 70–72.)

In 2000, defendants Gaffney, Hoersten, Keithley, Patricy, Plush, Rae and Rosica received options dated August 1, 2000, at a strike price of $45.13. According to the complaint, the grant date and price coincide with the lowest price of KEI stock during the fourth quarter of its 2000 fiscal year. The stock price proceeded to rise 56.22% by the end of the quarter, less than two months later. (Compl. ¶ 72.) The Board met on July 21, 2000. At that meeting, the Board discussed the handling of the 2000 option grants in light of considerable recent volatility in KEI's stock price. (Compl. ¶ 73.) On August 1, 2000, a team of unidentified KEI executives met to discuss the option grants. (Compl. ¶ 74.) At some point during the process of considering the 2000 option grants, a printout of historical KEI stock prices showing prices from July 21, 2000 through August 3, 2000 was created. Some unidentified person circled the August 1, 2000 date as the lowest price during that period. (Compl. ¶ 75.) Unlike prior years, the members of the Compensation Committee are now unable to recall whether, in fact, the option grants were approved at the August 1, 2000 meeting. (Compl. ¶ 74.) Contrary to established policies and procedures, the August 1, 2000 grants were not entered into the Equity Edge software system until August 7, 2000, by which time the stock had risen to $57.00, 26.3% higher than on the purported date of the grant. (Compl. ¶ 76.) Defendants Keithley and Plush, neither of whom was on the Compensation Committee, allegedly participated in the decision process regarding the 2000 options. (Compl. ¶ 77.)

The 2001 stock options recipients were Estler, Gaffney, Hoersten, Keithley, Plush, Rae and Rosica. The grant date was July 24, 2001 and the exercise price was $18.41. According to Plaintiffs, the grant date and price coincide with one of the lowest closing prices of the fiscal year. (Compl. ¶ 79.) The Compensation Committee and the full Board met on July 20, 2001 and approved the grants. As in 2000, a historical printout of stock price information was produced. The printout listed prices from July 20, 2001 through August 8, 2001. The lowest closing price during that period occurred on July 24, 2001. That date and

price ultimately was selected for the options grants. According to Plaintiffs, Keithley and Plush again participated in the decision-making process regarding the option grants. Despite the formalized procedures for doing so, the grant information was not entered into the system until August 13, 2001. By that date, the stock price had risen by 14.2% from the price on the grant date. (Compl. ¶ 80.)

Options were granted to Estler, Gaffney, Hoersten, Keithley, Pesec, Plush, Rae and Rosica in 2002. The grant date was July 23, 2002, and the exercise price was $13.76. According to Plaintiffs, the grant came after a significant price drop, and just before a sharp rise. (Compl. ¶ 81.) The Compensation Committee and the full Board met and approved the grants on July 19, 2002. Again a printout of historical stock prices was produced showing prices from July 19, 2002 to July 24, 2002. The lowest closing price in this range occurred on July 23, 2002. This date was circled on the printout, and was selected for the grant date and price. The information was not entered into the system until July 27, 2002. Despite having no role in the Compensation Committee, Keithley and Plush allegedly participated in the decision making. (Compl. ¶ 82.)

### D. SEC Filings

KEI filed 10-K annual reports with the SEC for every fiscal year from 1995 to 2006 in December of each year. (Compl. ¶ 92.) Defendants Keithley and Plush, as CEO and CFO, respectively, filed certifications of KEI's financial reports on each

Form 10-Q and 10-K filed after August 2002, pursuant to the requirements of Section 906 of the Sarbanes–Oxley Act of 2002. (Compl. ¶ 93.) These certifications state that each 10-Q and 10-K "fully complies with the requirements of section 13(a) or 15(d) of the [Exchange Act]," and that the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." (Compl. ¶ 93.)

Plaintiffs allege that proxy statements filed with the SEC and disseminated to shareholders annually from 1995 to 2002 falsely reported the grant date of options. (Compl. ¶ 95.) Plaintiffs further allege that a total of thirty-three (33) Form 4[9] filings between November 6, 2003 and January 6, 2006 reported false grant dates. (Compl. ¶ 96.)

### E. Special Committee

On August 11, 2006, two days after this action commenced, the Board appointed a special committee (the "Special Committee") to review the company's stock option practices from 1995 to the present. (Compl. ¶ 7.) KEI has not disclosed the composition of the Special Committee or the basis for the alleged independence of its membership. (Compl. ¶ 9.) The Special Committee retained the law firm of Jones Day to conduct the internal corporate investigation. (Compl. ¶ 7.) On September 14, 2006, the United States Securities and Exchange Commission ("SEC") began its own investigation into option practices at KEI. (Compl. ¶ 100.)

---

**9.** Insiders are required to disclose any change in share ownership within ten days after the close of each calendar month in which the change occurs by reporting the change on a Form 4 filed with the SEC. The Form 4 is entitled Statement of Changes in Beneficial Ownership, and sets forth the insider's name, the date of the transaction, the number of shares sold or bought and the price per share. *See Payne v. DeLuca*, 433 F.Supp.2d 547, 566 n. 11 (W.D.Pa.2006) (citing *Tristar Corp. v. Freitas*, 84 F.3d 550, 552–53 (2d Cir.1996)); *see also In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F.Supp.2d 576, 593 n. 12 (S.D.Tex.2003).

The Special Committee announced its findings in a press release issued December 29, 2006. (Compl. ¶ 90.) The press release set forth the following findings: (1) there was no evidence that the stock options grants were backdated (i.e. that the grant date was altered to reflect a date prior to the date of actual Board approval of the grant); (2) there was a multi-day delay in setting the exercise price for the options grants in 2000, 2001, and 2002, which resulted in lower exercise prices than existed on the actual date the grants were approved; (3) although the plans required the options to be priced on the date of Board approval, the Special Committee found no intentional misconduct on the part of any KEI employees responsible for administering the option grants; (4) the dates selected for the 2000, 2001 and 2002 grants were the appropriate measurement dates for accounting purposes; (5) with respect to the non-annual grants (generally given to new hires and existing employees upon promotion), management exceeded some aspects of the authority granted by the plans, but these grants involved small numbers of shares, and the procedural deviations were largely the result of ministerial errors. (Compl. ¶ 90.) The press release also indicated that KEI would not restate any historical financial statements. (Compl. ¶ 8.)

In addition to the press release, Jones Day authored an outline (the "Outline") of the Special Committee's findings. (Compl. ¶ 9.) According to Plaintiffs, the Outline acknowledged that (1) certain option grants carried exercise prices that were lower than the stock price on the date those grants were approved by the Board; (2) the Board did not possess documentation to support the grant date and price regarding certain other grants; and (3) management exceeded its authority under the stock option plans (specifically, that Keithley and Plush, without any formal delegation of authority, were involved in selecting grant dates and exercise prices regarding the 2000, 2001 and 2002 options that were beneficial to themselves, despite the fact that the plans require the Compensation Committee (of which they were not members) to select and approve grants). (Compl. ¶ 9.) The Outline specifically stated that, "[o]n a few occasions between April 2000 and January 2003, discretionary stock option grant dates were selected based in part upon the price of the Company's stock on the grant date." (Compl. ¶ 59.)

At the time this action was commenced, the Board consisted of ten members: defendants Bachman, Bartlett, Griswold, Hendrix, Keithley, Reddy and White, and non-parties Brian Jackman, Thomas Saponas, and Barbara Scherer (the "Demand Board"). (Compl. ¶ 136.) Plaintiffs did not ask the Demand Board to initiate action against the company based on the alleged options manipulation. (Compl. ¶ 135.)

## II. Law and Analysis

### A. Legal Standard

In deciding a motion to dismiss, the allegations in the complaint are taken as true and viewed in the light most favorable to the non-moving party. A claim will not be dismissed "unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts to support his claim which would entitle him to relief." *Hiser v. City of Bowling Green*, 42 F.3d 382, 383 (6th Cir.1994); *see also Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 885 (6th Cir.1990). Generally, a claim need only give fair notice as to the grounds upon which it rests. *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir.1993). However, in a shareholder derivative suit, a plaintiff must allege, with

particularity, that a pre-suit demand was made upon the Board or the reasons for not doing so. *See* Fed.R.Civ.P. 23.1; Ohio Civ. R. 23.1. This requirement differs substantially from the principles of notice pleading. *See McCall v. Scott*, 239 F.3d 808, 815 (6th Cir.2001) (*citing Brehm v. Eisner*, 746 A.2d 244, 254 (Del.2000)).

■ On a motion to dismiss under Rule 12(b)(6), the court must accept all factual allegations in the complaint as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007). The court must also construe the complaint in the light most favorable to the nonmoving party. *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir.1998). The court need not, however, accept the plaintiff's legal conclusions and unwarranted factual inferences. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege either direct or inferential allegations regarding all of the material elements necessary to sustain recovery under some viable legal theory. *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir.1995). A well-pleaded allegation is one that alleges specific facts and does not merely rely upon conclusory statements.

■ In the context of a motion to dismiss a securities fraud claim, a court "may consider the full text of the SEC filings, prospectus, analyst's reports and statements 'integral to the complaint,' even if not attached, without converting the motion into one for summary judgment under Fed.R.Civ.P. 56." *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360–61 (6th Cir.2001) (citing *I. Meyer Pincus & As-*

*socs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir.1991)). In addition, the Court may consider documents to which the plaintiffs refer in their complaint, even if the plaintiffs do not attach them as exhibits, as long as these documents are central to plaintiffs' claims. *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir.1997). Similarly, the Court may consider public records and matters of which a court may take judicial notice without converting the motion to dismiss into a motion for summary judgment. *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir.1999).

### B. Demand Futility

■■ Defendants move to dismiss this action based upon Plaintiffs' failure to make a pre-litigation demand to the Board. Federal Rule of Civil Procedure 23.1 provides that in a shareholder derivative action, the complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Motions to dismiss for failure to allege demand futility are considered under Fed. R.Civ.P. 12(b)(6). *McCall*, 239 F.3d at 815. Whether to excuse the failure to make demand is determined under the substantive law of the state of incorporation. *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 96–97, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). KEI is an Ohio corporation, so the Court applies Ohio law to determine whether demand may be excused.[10]

---

10. The Court also will consult Delaware law regarding demand futility. The demand futility issues raised in this case are numerous, complex, and potentially dispositive. The issues are also rather new, given the recent emergence of stock option backdating, and there are no such cases interpreting Ohio law. By comparison, the body of case law inter-

■ In Ohio, the "directors of a corporation are charged with the responsibility of making decisions on behalf of the corporation and are the proper parties to bring a suit on behalf of the corporation or, in their business judgment, to forego a lawsuit." *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 617–18 (6th Cir.2008) ("*Ferro II*") (quoting *Drage v. Procter & Gamble*, 119 Ohio App.3d 19, 24, 694 N.E.2d 479 (1st Dist.1997)). Ohio state law provides that "[e]xcept where the law, the articles, or the regulations require action to be authorized or taken by shareholders, all of the authority of a corporation shall be exercised by or under the direction of its directors." Ohio Rev.Code § 1701.59(A).

■ Under Ohio law, it is presumed that any action taken by a director on behalf of the corporation is taken in good faith and for the benefit of the corporation. Ohio Rev.Code § 1701.59(C)(1); *Drage*, 119 Ohio App.3d at 25, 694 N.E.2d 479 (citation omitted). The board of directors has the primary authority to file a lawsuit on behalf of the corporation. *Flarey v. Youngstown Osteopathic Hosp.*, 151 Ohio App.3d 92, 95, 783 N.E.2d 582 (7th App. Dist.2002) (citing *Wadsworth v. Davis*, 13 Ohio St. 123, 130–131 (1862)). The shareholders may make a demand on the directors to bring a suit on behalf of the corporation, but no shareholder has an independent right to bring suit unless the board refuses to do so *and* that refusal is wrongful, fraudulent, or arbitrary, or is the result of bad faith or bias on the part of the directors. *Drage*, 119 Ohio App.3d at 24, 694 N.E.2d 479 (citing *Cooper v. Cent.*

*Alloy Steel Corp.*, 43 Ohio App. 455, 459–60, 183 N.E. 439 (5th Dist.1931)).

■ An exception to the general demand rule permits a shareholder to proceed with an independent suit without making a demand when the shareholder can demonstrate that the demand would have been futile. Ohio Civ. R. 23.1. "Futility means that the directors' minds are closed to argument and that they cannot properly exercise their business judgment in determining whether the suit should be filed. It is not enough to show that the directors simply disagree with a shareholder about filing a suit." *Drage*, 119 Ohio App.3d at 25, 694 N.E.2d 479.

Establishing demand futility under Ohio law "is not an easy task." *In re Ferro Corp. Derivative Litig.*, No. 1:04CV1626, 2006 WL 2038659 at *5 (N.D.Ohio Mar. 21, 2006) ("*Ferro I*") (citations omitted). The demand requirement is not a procedural technicality. "Rather, it serves the very important purpose of ensuring that before a shareholder derivative suit is brought, the company's board of directors has considered all possible intracorporate remedies." *Grand Council of Ohio v. Owens*, 86 Ohio App.3d 215, 221, 620 N.E.2d 234 (10th Dist.Ct.App.1993) (quoting *Smachlo v. Birkelo*, 576 F.Supp. 1439, 1443 (D.Del. 1983)). Corporate management must have the first opportunity to initiate litigation, since the responsibility for determining whether or not the corporation should pursue a claim in court ordinarily is an issue of internal management that rests within the discretion of the directors. *Davis v. DCB Fin. Corp.*, 259 F.Supp.2d 664, 670 (S.D.Ohio 2003).

preting Delaware corporation law on demand futility in the context of option backdating allegations is highly developed. The Court perceives no substantive difference between Ohio and Delaware law on this issue, and Ohio courts routinely look to Delaware case law for guidance in deciding corporate law

issues generally, and demand futility issues specifically. *Cf. Drage*, 119 Ohio App.3d at 25, 694 N.E.2d 479. Both parties repeatedly reference cases dealing with Delaware law in their briefs. Accordingly, the Court refers often to such authorities, and treats those cases as highly persuasive.

890

To excuse demand, a plaintiff must overcome the presumption that the board of directors can make an unbiased, independent business decision about whether it would be in the corporation's best interests to bring a lawsuit.[11] *Drage,* 119 Ohio App.3d at 25, 694 N.E.2d 479. Accordingly, "a bare allegation that the directors would not want to sue themselves or each other does not show that demand would be futile." *Id.*; *see also Carlson v. Rabkin,* 152 Ohio App.3d 672, 680–81, 789 N.E.2d 1122 (1st App.Dist.2003). Plaintiffs are required to show that the presumption of independence does not exist. *Id.* at 26, 694 N.E.2d 479. "Ohio courts have found a demand presumptively futile 'where the directors are antagonistic, adversely interested, or involved in the transactions attacked.'" *Ferro II,* 511 F.3d at 618 (quoting *Bonacci v. Ohio Highway Express, Inc.,* No. 60825, 1992 WL 181682, at *4 (Ohio Ct.App. 8th Dist. July 30, 1992)). "Examples of when a demand would be excused as futile include when all directors are named as wrongdoers and defendants in a suit, when there is self-dealing by the directors such that the directors gain directly from the challenged transactions, or when there is domination of nondefendant directors by the defendant directors." *Carlson,* 152 Ohio App.3d at 681, 789 N.E.2d 1122. The shareholders bear the burden of proving futility. *Drage,* 119 Ohio App.3d at 25, 694 N.E.2d 479.

Demand futility is assessed with respect to the board as it existed at the time the complaint was filed. *McCall,* 239 F.3d at 816; *Drage,* 119 Ohio App.3d at 26, 694 N.E.2d 479. To establish futility, Plaintiffs must show that a majority of the Board members are subject to a disqualifying interest. *McCall,* 239 F.3d at 826; *Drage,* 119 Ohio App.3d at 29, 694 N.E.2d 479. To excuse demand in this case, Plaintiffs must set forth particularized facts establishing that a least five of the ten KEI Board members as of August 9, 2006, were not sufficiently disinterested, and therefore could not have considered a demand fairly.

A director is considered interested when, for example, he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have a "materially detrimental impact" on a director but not the corporation or its stockholders. *Rales v. Blasband,* 634 A.2d 927, 936 (Del.1993). While the mere threat of personal liability is not sufficient, reasonable doubt as to the disinterestedness of a director is created when the particularized allegations in the complaint present "a substantial likelihood" of liability on the part of a director. *See Rales,* 634 A.2d at 936 (quoting *Aronson v. Lewis,* 473 A.2d 805, 815 (Del.1984)); *In re Baxter Int'l, Inc. S'holders Litig.,* 654 A.2d 1268 (Del.Ch.1995).

**11.** Courts assessing demand futility under Delaware law apply one of two tests. Where the challenged transaction was approved by the board, demand is futile where, "under the particularized facts alleged, a reasonable doubt is created that (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis,* 473 A.2d 805, 814–15 (Del.1984). Under the *Aronson* test, if either prong is satisfied with respect to half or more of the board members at the time the complaint was filed, demand is excused. *Brehm v. Eisner,* 746 A.2d 244, 256 (Del. 2000). If the board did not approve the challenged transaction, then the *Aronson* test does not apply, and demand is excused if the well-pleaded allegations of the complaint give rise to a reasonable doubt that the board can exercise "its independent and disinterested business judgment in responding to a demand." *Rales v. Blasband,* 634 A.2d 927, 933–34 (Del.1993).

■ The Court must examine the totality of the circumstances, *McCall,* 239 F.3d at 816–17 (citing *Harris v. Carter,* 582 A.2d 222, 229 (Del.Ch.1990)), but aggregation of a number of factors, none of which individually excuses demand, does not excuse demand. *In re Pfizer Inc. Derivative Sec. Litig.,* 503 F.Supp.2d 680, 686 (S.D.N.Y.2007); *Rist v. Stephenson,* Nos. 05–CV2326 & 05–CV–2600, 2007 WL 2914252, at *11 (D.Colo. Oct. 1, 2007).

### 1. Creation of Special Committee

■ Plaintiffs first contend that demand would have been futile, and no inquiry into the disinterestedness of individual directors is needed, because the Board responded to this lawsuit by creating the Special Committee, which the Board tasked with investigating Plaintiffs' claims. Plaintiffs argue that the creation of the Special Committee by the Board may be viewed by the Court as a concession of demand futility. In support of this proposition, Plaintiffs cite *In re FirstEnergy S'holder Derivative Litig.,* 320 F.Supp.2d 621, 626–27 (N.D.Ohio 2004). In *First-Energy,* the corporate defendant created an independent committee to investigate derivative claims raised by the plaintiffs. 320 F.Supp.2d at 626–27. The court concluded that the plaintiffs pleaded demand futility with sufficient particularity. *Id.* at 624. In a footnote, the *FirstEnergy* court stated: "If a board responds to a derivative suit by appointing a special litigation committee with the sole authority to evaluate whether to pursue the litigation before making a motion to dismiss for failure to make a demand, then a court may conclude that the board has conceded its disqualification and therefore demand may be excused." 320 F.Supp.2d at 627, n. 5.

*FirstEnergy* does not, however, stand for so expansive a proposition as Plaintiffs suggest, and in any event, is distinguishable on its facts. As Defendants point out, Plaintiffs' argument ignores the critical distinction between a special litigation committee and an investigatory committee. The distinction lies in the authority vested in the committee by the Board. Creation of a special litigation committee vested by the board with the power to determine whether to pursue certain litigation can imply that the board is not disinterested. *See FirstEnergy,* 320 F.Supp.2d at 627 (citing *Peller v. Southern Co.,* 911 F.2d 1532, 1537 (11th Cir.1990)). No case so much as suggests that the creation of a special litigation committee ipso facto establishes demand futility. In *FirstEnergy,* the existence of the special litigation committee was just one of many factors supporting a finding of demand futility. Other factors included the detailed allegations of wrongdoing against each of the defendant directors, the complaint's recitation of numerous intertwining relationships between directors suggesting a lack of independence, the existence of an "insured versus insured" coverage exclusion in the directors' insurance policy, and that FirstEnergy already was the subject of a pending criminal investigation and civil lawsuits. 320 F.Supp.2d at 624–25. Moreover, *FirstEnergy* is distinguishable because, as a matter of fact, the committee created by KEI in this case was not a special litigation committee, as it lacked any authority to determine whether the company would pursue litigation arising out of its stock options practices. Furthermore, Ohio case law establishes that the futility issue "must be determined by looking at the positions of the parties when the derivative suit is initially filed." *Drage,* 119 Ohio App.3d at 26, 694 N.E.2d 479. The Board did not create the committee until after the filing of the first derivative suit. Under *Drage,* the fact is, therefore, completely irrelevant. *Id.*

Accordingly, the Court rejects Plaintiffs' contention that demand should be excused as futile based solely on the creation of the Special Committee by the Board.

### 2. Receipt of Personal Financial Benefit

■ Plaintiffs assert that Defendant Keithley is interested by virtue of his receipt of 320,000 allegedly manipulated stock options. It is well established that ordinary director compensation alone is insufficient to show demand futility. *Loveman v. Lauder*, 484 F.Supp.2d 259, 269 (S.D.N.Y.2007); *In re Coca–Cola Enters., Inc. Derivative Litig.*, 478 F.Supp.2d 1369, 1376 (N.D.Ga.2007). In addition to his receipt of options, Plaintiffs also allege that Keithley impermissibly participated in the review and approval of certain option grants from which he benefited personally, despite provisions in the Plans designed to prevent such conflicts. KEI's shareholder constituency did not share equally in the benefit to Keithley from the option grants. Because Keithley may have had a hand in approving his own option grants, contrary to the terms of the shareholder approved stock option Plans, the Court concludes that Plaintiffs have pleaded sufficient facts giving rise to reasonable doubt that Keithley was not disinterested. *See In re Zoran Corp. Derivative Litig.*, 511 F.Supp.2d 986, 1008 (N.D.Cal.2007) (finding allegations that six of eight board members received backdated options sufficient to render them interested and excuse demand).

None of the other nine directors on the Demand Board received any options at all, and therefore did not receive a personal financial benefit from the allegedly manipulated options. Accordingly, the Court concludes that this argument serves to establish only that Keithley possessed a dis-abling interest. In order to excuse demand as futile, Plaintiffs must show that at least four other members of the Demand Board were not disinterested.

### 3. Control

■ Plaintiffs allege in the Complaint (though not at all in the response to the motion to dismiss) that the entire Board is controlled by Keithley, based on two facts: (1) Keithley is the son of the company founder and (2) Keithley controls 60.2% of the voting power of KEI shares. (Complaint at ¶ 139.)[12]

> A controlled director is one who is dominated by another party, whether through close personal or familial relationship or through force of will. A director may also be deemed "controlled" if he or she is beholden to the allegedly controlling entity, as when the entity has the direct or indirect unilateral power to decide whether the director continues to receive a benefit upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenged transaction objectively.

*Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del.2002) (citations omitted). Plaintiffs' allegations in this regard are conclusory. Plaintiffs have pleaded no particularized facts demonstrating that Keithley controls any individual director, let alone the entire Board. The argument rests entirely on the two facts stated above. Such superficial allegations, particularly those regarding majority voting power, are rejected routinely as insufficient to establish that a board of directors is controlled. *See e.g. In re IAC/InterActiveCorp Sec.*

12. Rather paradoxically, Plaintiffs allege in the very same paragraph that Keithley is "subject to improper influence from members of the Compensation Committee." (Complaint at ¶ 139.)

*Litig.*, 478 F.Supp.2d 574, 600 (S.D.N.Y. 2007); *Zimmerman v. Braddock*, No. 18473-NC, 2005 WL 2266566, at *8 (Del. Ch. Sept. 8, 2005), *Beam v. Stewart*, 833 A.2d 961, 978–79 (Del.Ch.2003); *Kaster v. Modification Sys.*, 731 F.2d 1014, 1019–20 (2d Cir.1984).

#### 4. Personal/Business Relationships

 Plaintiffs also contend that defendant Reddy lacks independence because of his longstanding personal and professional relationship with Keithley. (Complaint at ¶ 136f.) Again, Plaintiffs make no mention of this contention in opposing the motion to dismiss. Directorial independence "may be compromised by financial, familial or social ties to other persons who are interested in the board's decision, but only if the plaintiffs plead facts that would support the inference that the director would be more willing to risk his or her reputation than to risk the relationship with the interested person." *In re Sonus Networks, Inc. S'holder Derivative Litig.*, 499 F.3d 47, 67 (1st Cir.2007) (citing *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1052 (Del.2004)). The only fact set forth in the Complaint regarding the relationship between Reddy and Keithley is that both serve on the board of directors at another unaffiliated company. In all likelihood, such an allegation—that two individuals on a board also serve together on another board—could be levied against hundreds, if not thousands, of public company directors. Nothing about the relationship between Reddy and Keithley, as alleged by

Plaintiffs, so much as hints at an inference that Reddy would sacrifice his personal reputation for the sake of his relationship with Keithley. This allegation falls far short of what is required to establish a reasonable doubt about Reddy's independence.

#### 5. Failure to Void Stock Options

 Plaintiffs contend in the Complaint (though, as appears to be their wont, not in the opposition) that demand should be excused because the Board failed to void the stock option grants at issue after discovering, via the Special Committee investigation, that those grants were not made in compliance with the Plans. Plaintiffs argue that the Board's failure to take action to recover the gains of those defendants who received the allegedly manipulated options is not protected by the business judgment rule, and therefore saddles its members with a disqualifying interest. (Compl. ¶ 140.) This argument ignores that, as a matter of Ohio law, demand futility is assessed as of the filing of the initial complaint. *Drage*, 119 Ohio App.3d at 26, 694 N.E.2d 479. The Board did not receive the results of the Special Committee investigation until well after Plaintiffs commenced this lawsuit, and therefore, anything reported to the Board by the Special Committee is not appropriately considered in assessing demand futility. Accordingly, the Court finds that this argument cannot be used by Plaintiffs to support their contention that demand should be excused.[13]

---

**13.** Even if appropriately considered, this argument is a variation on one of two familiar demand excusal arguments, both of which frequently are rejected. One is that, in order to bring suit, the directors would be forced to sue themselves, which renders them sufficiently interested to excuse demand. "[T]he incantation that demand is excused because the directors otherwise would have to sue themselves, thereby placing the conduct of the litigation in hostile hands and preventing its effective prosecution [. . .] has been made to and dismissed by other courts." *Aronson*, 473 A.2d at 818. The bare claim that a board is unwilling to sue itself, without specific factual support, is insufficient. *Drage*, 119 Ohio App.3d at 25, 694 N.E.2d 479; *Aronson*, 473 A.2d at 818. In fact, "a failure of the board

## 6. Insured Versus Insured Exclusion

 The Complaint also includes an allegation that demand would be futile because KEI's directors and officers liability insurance policy contains an "insured versus insured" exclusion that disclaims coverage for lawsuits between directors. (Compl. ¶ 141). Plaintiffs do not advance this contention in their response to support the demand futility argument. Courts examining Delaware law reject this argument routinely. *See Coca–Cola Enters.,* 478 F.Supp.2d at 1377; *Halpert Enters. Inc. v. Harrison,* 362 F.Supp.2d 426, 433 (S.D.N.Y.2005). At first glance, however, this argument appears to have enjoyed some success in one Ohio court:

> Certainly, a provision prohibiting directors from bringing suits against each other would deprive the directors of the ability to exercise independent judgment as to the advisability of instituting action against any officer or director for mismanagement, and thereby [divest them] of the power to govern this aspect of the corporation's affairs.

*Drage,* 119 Ohio App.3d at 27, 694 N.E.2d 479. The appearance of success, however, is illusory; the *Drage* court ultimately refused to excuse demand. *Id.* at 26–31, 694 N.E.2d 479. Furthermore, the Court concurs with the assessment of the district court in *Ferro I* that this statement is *dicta,* is not authoritative, does not bind a federal court applying state law, and is based on citation to three cases, of which none remain good law. *Ferro I,* 2006 WL 2038659, at *7.[14] The Court also agrees that, if the Ohio Supreme Court were to consider this issue, it would reject the *dicta* from *Drage,* and conclude, as have the vast majority of courts, that the presence of an "insured versus insured" exclusion in a D & O policy does not render prelitigation demand futile. *Id.* at *8; *accord In re Goodyear Tire & Rubber Co. Derivative Litig.,* Nos. 5:03CV2180, 5:03CV2204, 5:03CV2374, 5:03CV2468, 5:03CV2469, 2007 WL 43557, at *6 (N.D.Ohio Jan. 5, 2007).

## 7. Potential Liability of Compensation Committee Members

Finally, the Court addresses Plaintiffs' contention that demand must be excused because a majority of the Board lacked the requisite disinterestedness because those who served on the Compensation Committee and approved the allegedly backdated options face a substantial likelihood of liability. Specifically, Plaintiffs argue that individual defendants Bachman, Bartlett, Griswold, Hendrix, Reddy and White (a majority of the Demand Board's ten members), each of whom serves or served on the Compensation Committee, must be

---

to sue will always be present in the demand futility context, and it cannot, by itself, indicate interestedness." *Ji v. Van Heyningen,* No. CA 05–273 ML, 2006 WL 2521440, at *11 (D.R.I. Aug. 29, 2006) (citations omitted). The other frequently invoked theme under which this argument falls is that demand would be futile because the directors failed to take action. *See e.g. In re Verisign, Inc., Derivative Litig.,* 531 F.Supp.2d 1173, 1194–95 (N.D.Cal.2007). As in *Verisign,* the argument fails in this case for two reasons. First, Plaintiffs' "failure to act" allegation is made in a blanket manner as to the entire Board, and no particularized facts are offered regarding any of the individual directors, and therefore does not support an inference that any particular director possessed a disabling interest or conflict. *Id.* Furthermore, allegations of this kind "essentially constitute an attempt to plead a claim of 'failure of oversight,'" which is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Id.* (quoting *In re Caremark Int'l, Inc. Derivative Litig.,* 698 A.2d 959, 967 (Del.Ch.1996)).

**14.** The Sixth Circuit affirmed the district court on this point. *Ferro II,* 511 F.3d at 622–23.

deemed interested because each bears a substantial likelihood of personal liability based on their alleged complicity in the backdating activities.[15]

The demand futility issue thus turns entirely on whether the allegations in the Complaint sufficiently establish a substantial likelihood of liability as to any four of the following group of directors: Bachman, Bartlett, Griswold, Hendrix, Reddy and White. The allegations against these directors are, for the most part, not individualized, but rather are generic statements regarding the group based on their status as members of the Compensation Committee and the Board. Plaintiffs do not make any specific statements regarding actions taken, or knowledge possessed, by particular directors. Assuming for purposes of this analysis that the option grants identified by Plaintiffs were indeed backdated, the allegations against these individual directors effectively consist of the following: (a) that each of the individuals was a member of both the Compensation Committee and the Board at large at times when the allegedly manipulated grants were issued; (b) that the individuals, in their capacity as Board and Compensation Committee members, approved the option grants; (c) that the individuals knew, or are chargeable with knowledge, that the shareholder approved stock option Plans required option grants to reflect the fair market price on the date of the grant; (d) that backdated option grants violated the terms of the Plans; and (e) that the Board's directors and officers ("D & O") insurance policy contained an "insured versus insured" exclusion. The relevant question for purposes of demand excusal is whether these allegations support a reasonable inference that a majority of the individual directors on the Demand Board bear a substantial likelihood of personal liability.

■■■■ Generally, to show that the potential for liability rises to a "substantial likelihood," the plaintiff must plead particularized facts "detailing the precise roles that these directors played at the company, the information that would have come to their attention in these roles, and any indication as to why they would have perceived the [wrongdoing]." *Guttman v. Huang*, 823 A.2d 492, 502 (Del.Ch.2003). "Mere membership on a committee or board, without specific allegations as to defendants' roles or conduct, is insufficient to support a finding that the directors were conflicted." *CNET*, 483 F.Supp.2d at 963. In this case, Plaintiffs allege no facts explaining what role, if any, each individual director played in the alleged wrongdoing. Plaintiffs repeatedly allege that the options backdating was "knowing and intentional," but make no particularized allegations regarding whether or when any director knew of the alleged options manipulation, or that any director intentionally backdated any option grant.

### a. Options Backdating Cases

Plaintiffs rely heavily on the Delaware Court of Chancery opinion in *Ryan v. Gifford*, 918 A.2d 341 (Del.Ch.2007). In *Ryan*, a derivative action arising from allegations of options backdating, the Delaware Court of Chancery denied the defendants' motion to dismiss on demand futility grounds. The court first applied the *Aronson* analysis that permits demand excusal where the plaintiff raises a reason to doubt whether the challenged transactions

---

**15.** Plaintiffs have not challenged the independence or disinterestedness of non-party Board members Jackman, Saponas and Scherer, none of whom ever served on the Compensation Committee. In addition, while Reddy allegedly served on the Compensation Committee from 2002 to 2004, he apparently did not begin service until after the last allegedly backdated options were approved on July 23, 2002. (Compl. ¶¶ 20, 138.)

constituted a valid exercise of business judgment, and found that the plaintiff established futility. *Id.* at 354. The facts were as follows. The plaintiff alleged that the board of directors ignored limitations set out in the company's stock option plans and in doing so exceeded the shareholders' express grant of authority. *Id.* at 355. Specifically, the stock option plans permitted the board to delegate option granting powers to a committee. *Id.* at 353. The board in fact delegated the responsibility to a three-member compensation committee, which constituted half of the six-member board. *Id.* The terms of the stock option plans required the exercise price of options to be set at 100% of the fair market value of the stock on the date of the grant. *Id.* at 354. The plans did not give the board (or the committee) the power to contravene the provisions of the plans. *Id.*

The plaintiff identified nine option grants over a six-year period, each of which was granted "during the lowest market price of the month or year in which it was granted." [16] *Id.* The plaintiff supported the backdating allegations with an empirical analysis performed by Merrill Lynch comparing the stock price performance following option grants to the firm's general stock price performance over longer time periods. The comparison measured the aggressiveness of the timing of the option grants, and revealed that the average annualized return on option grants to management was 243%, nearly ten times higher than the general 29% market returns on the stock during the same period. *Id.* In a footnote, the court addressed the defendants' argument that the plaintiff's allegations regarding the directors' knowledge were not particularized sufficiently because they did not directly allege knowledge on behalf of the directors:

> [I]t is difficult to understand how a plaintiff can allege that directors backdated options *without* simultaneously alleging that such directors *knew* that the options were being backdated. After all, any grant of options had to have been approved by the committee, and that committee can be reasonably expected to know the date of the options as well as the date on which they actually approve a grant. Nor is it a defense to say that directors might not have had knowledge that backdating violated their duty of loyalty. Directors of Delaware corporations should not be surprised to find that lying to shareholders is inconsistent with loyalty, which necessarily required good faith.

*Id.* at 355, n. 35.

The court in *Ryan* concluded, in the alternative, that demand also was futile under the *Rales* test, which applies when the entire board does not approve the challenged transaction and requires pleading of particularized facts creating a reasonable doubt that a majority of the directors would have considered the demand independently and disinterestedly. *Id.* The court in *Ryan* stated, in broad language seized upon here by Plaintiffs, that

> [a] director who approves the backdating of options faces at the very *least* a substantial likelihood of liability, if only because it is difficult to conceive of a context in which a director may simultaneously lie to his shareholders (regarding his violations of a shareholders-approved plan, no less) and yet satisfy his duty of loyalty. Backdating options

---

**16.** It is not clear exactly what the court in *Ryan* meant when it said that the options were granted "during" the lowest market price of the month (or year). Use of the word "during," rather than "at," implies that the options were granted at some price in a range of prices prevailing in a discrete period of time characterized by relatively low prices, but not necessarily the lowest price in the range.

qualifies as one of those "rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment and a substantial likelihood of director liability therefore exists." *Id.* at 355–56, (quoting, in part, *Aronson*, 473 A.2d at 815). The court found the plaintiff's allegations that three members of the six-person board approved the allegedly backdated options, and another member accepted them, sufficient to establish a substantial likelihood of director liability as to a majority of the board. *Id.* at 356. Significantly, the plaintiff's complaint included specific allegations that four directors were familiar with the company's stock option plans and recommended the most recent plan for approval by shareholders. *Id.* at 356, n. 38.

Several subsequent courts, confronting similar allegations of options backdating and the *Ryan* decision, found *Ryan* distinguishable. *See In re Computer Sciences Corp. Derivative Litig.*, No. CV 06–5288 MRP, 2007 WL 1321715 (C.D.Cal. Mar. 26, 2007); *In re CNET Networks, Inc. S'holder Derivative Litig.*, 483 F.Supp.2d 947 (N.D.Cal.2007); *In re Openwave Sys. Inc. S'holder Derivative Litig.*, 503 F.Supp.2d 1341 (N.D.Cal.2007); *Desimone v. Barrows*, 924 A.2d 908 (Del.Ch.2007); *In re PMC–Sierra, Inc. Derivative Litig.*, No. C 06–05330 RS, 2007 WL 2427980 (N.D.Cal. Aug. 22, 2007); *In re Verisign, Inc., Derivative Litig.*, 531 F.Supp.2d 1173 (N.D.Cal. 2007).[17] The shared theme of the opinions distinguishing *Ryan* is their common view

that the factual allegations they faced did not rise to the level of detail and persuasiveness of those presented in *Ryan*. Careful examination of the facts of several of these cases is instructive.

In *Computer Sciences*, the complaint alleged that the compensation committee of the board bore responsibility for review and approval of stock option awards to the company's insiders. *Computer Sciences*, 2007 WL 1321715, at *8. Three director-defendants served on the compensation committee, but only two of them served during the period in which backdating occurred. The court found such allegations—which consisted of (1) service by the individuals on the compensation committee (2) at the time the allegedly backdated options were issued (3) where the compensation committee was specifically responsible under its charter for reviewing and approving stock option awards—sufficiently particularized to create a reasonable doubt as to the interestedness of the two directors who served on the compensation committee when allegedly backdated options were approved "due to their direct participation in the options backdating transactions as the primary gatekeepers for CSC's options grant process [ . . . ]." *Id.* The court ultimately determined not to excuse demand as futile because the plaintiff was able only to impugn the disinterestedness of three directors (one alleged recipient of backdated options, and the two compensation committee members), which constituted less than a majority of the board.[18] *Id.* at *15. The court specifically

17. Although the *Verisign* decision is reported, at the time of the issuance of this memorandum opinion, the pagination of that decision was unavailable. Accordingly, all further references to *Verisign* herein are to the Westlaw-formatted citation.

18. In *Computer Sciences,* the court dismissed the complaint without prejudice and granted leave to amend. The plaintiff filed an amend-

ed complaint, and on a subsequent motion to dismiss, the court found that demand was not excused. The court determined that the plaintiff had shown only that two directors had disqualifying interests. A third director previously found to have a disqualifying interest served on the compensation committee and approved allegedly backdated options at a time when the plaintiff did not own stock,

addressed the *Ryan* decision, and while finding it factually distinguishable, stated its view of *Ryan*'s effect on the demand futility analysis in the context of options backdating allegations:

> The Court acknowledges the view advanced in [*Ryan* ], that a director faces a "substantial likelihood" of liability for options backdating, but notes that this "rule" only applies to directors who directly approved or received the backdated options, or who are dependent on those who did, and only when plaintiffs allege with particularity that the options backdating occurred. To apply this view as a rule ascribing liability and interest to all directors when the core allegations of backdating are comparatively weak and lack particularity would circumvent the demand requirement in every case where backdating and springloading of options is claimed.

*Id.* *Computer Sciences* thus appears to agree with *Ryan*'s conclusion that directors who, as members of a compensation committee charged with administering a company's stock option plan, approve backdated options, are subject to a disqualifying interest because they face a substantial likelihood of liability.

Other courts, however, confronted with very similar facts, found them insufficient to raise a reasonable doubt regarding the disinterestedness of any director. As in the instant case, in *CNET*, the plaintiffs alleged that all the director-defendants "ratified" the backdated option grants. 483 F.Supp.2d at 963. The court in *CNET* found the plaintiffs' allegations of ratification vague: "It is very unclear as to what plaintiffs mean by ratifying the grants—it could be post hoc approval, willingness to participate in a coverup, or knowing that the grants were backdated, or any number

of transgressions. Plaintiffs go into no further detail in their allegations." *Id.* The court concluded that "merely alleging that they ratified the grants as board members, without more, is not sufficient to plead with particularity that [the board members] were not disinterested or independent or that their decisions were not the product of valid business judgment." *Id.* at 965. Assessing the independence of two directors who served on the compensation committee when backdated options were issued, the *CNET* court stated that "where plaintiffs merely allege that approval was given without more, the facts pleaded simply do not support the inference that these two board members were not independent or disinterested or that their decisions were not protected by the business judgment rule." *Id.* at 966.

In *Verisign*, another case distinguishing *Ryan*, the court agreed with both of *Ryan*'s statements (a) that directors who approve backdated options face at least a substantial likelihood of liability, and (b) that options backdating qualifies as one of those "rare cases" where a transaction may be sufficiently egregious on its face that it loses the protection of the business judgment rule. *Verisign*, 531 F.Supp.2d at 1192–93 (citing *Ryan*, 918 A.2d at 355–56). Facing similar allegations of ratification by the board, the *Verisign* court went on to distinguish *Ryan* on the facts. In *Verisign*, the plaintiffs failed to provide any explanation regarding which of the directors allegedly "authorized" the backdated options, which directors "approved" the options, and/or which directors "ratified" the options, or what form the alleged authorization, approval and ratification took. *Id.* The court in *Verisign* also concurred with *CNET*'s characterization of

and the plaintiff thus lacked standing to raise any claims regarding that particular grant.

*See In re Computer Sciences Corp. Derivative Litig.,* 244 F.R.D. 580 (C.D.Cal.2007).

the ratification concept as too vague to support an inference of liability. *Id.*

Faced with the plaintiffs' contention that *Ryan* stands for the proposition that demand is excused upon a mere allegation that a company granted backdated options, the *Verisign* court did not disagree, but distinguished *Ryan* on grounds that the complaint failed to particularly allege "which director or directors approved which grant, or when such grant was approved and how it was backdated—and [included] no allegations showing how or why a particular director would know that the options were backdated." *Id.*[19] Moreover, in contrast to *Ryan,* a majority of the VeriSign directors at the time of the complaint were not on the board at the time of the alleged backdating. *Id.* Regarding the plaintiffs' allegations that certain board members served on various committees (including the compensation committee), and thus "the Board 'should have been aware' that VeriSign used different measurement dates when computing compensation costs for certain stock option grants; and claim that under the charters and policies of these three Committees, the directors had an obligation to investigate the differences in measurement dates and recorded dates of option grants," the court found such allegations "wholly insufficient" to excuse demand. *Id.* at 1194. To support this conclusion, the court in *Verisign* repeated its determination that the complaint failed to allege facts describing the part each director played, by virtue of committee service or otherwise, in the alleged wrongdoing. *Id.*

Here, Plaintiffs' allegations regarding the actual involvement of the individual directors in the alleged wrongdoing are similarly vague. Upon close examination, however, the facts alleged in *Ryan,* which that court found sufficient to excuse demand, were not so highly particularized. The cases distinguishing *Ryan* on the basis of its highly particularized allegations do not address in detail the exact allegations present in *Ryan* and absent from the distinguishing cases that make the difference. One that several courts cite as a distinguishing factor—the Merrill Lynch statistical analysis—is a rather compelling factor not presented here or in any other case where demand was not excused. It is clear, however, that such a detailed statistical analysis is not required to survive a motion to dismiss. *CNET,* 483 F.Supp.2d at 957–58. The Court is satisfied that Plaintiffs in this case have alleged the existence of backdated or otherwise manipulated option grants with particularity. The Outline commissioned at KEI's behest essentially admits as much.

The narrow question at issue then is whether such allegations, plus the rather generalized allegation that a majority of the current directors served on the Compensation Committee that approved the allegedly manipulated options were granted, is, without more, sufficient to excuse demand as futile because those directors bear a substantial likelihood of liability. Under *Ryan,* this would appear to be enough. The Complaint in this case contains virtually no factual allegations about the knowledge of the individual directors regarding the terms of the option grants at the time they approved them. Similarly little is said about what the directors actually did to approve the option grants. Nor, apparently, did the complaint in *Ryan* contain such specifics. The factual

---

**19.** This is, at least arguably, an overly narrow reading of *Ryan.* As in *Verisign,* the complaint in *Ryan* did not include particularized allegations regarding actual knowledge or conscious disregard of the backdating on the part of the directors. Accordingly, distinguishing *Ryan* on this basis alone would not have been appropriate.

allegations in this case regarding approval by the Compensation Committee of manipulated option grants virtually mirror those of *Ryan*. The Plans permitted the Board to delegate responsibility for administering the company's stock option Plans to the Compensation Committee. The Board did so.[20] The Plans also required the price of option grants to be set at 100% of fair market value on the date of the grant. The Compensation Committee approved grants where the price was not set at 100% of the fair market value on the date of the grant, thus exceeding its authority under the Plans. Nowhere does the *Ryan* court's decision reveal specific allegations regarding knowledge on the part of directors regarding backdated options. The court in *Ryan* characterized the board's decision to exceed the authority granted by the shareholder-approved stock option plans as "knowing and intentional," but the specific factual basis for this characterization vis-à-vis the individual directors, if any, is not stated.

*Ryan* thus appears to stand for the proposition that members of a compensation committee vested with authority to approve stock option grants, who in fact approve option grants that contravene the terms of stock option plans, face a substantial likelihood of liability for that conduct. This is so, under *Ryan*, without specific factual allegations regarding knowing wrongdoing on the part of the individual directors. Rather than requiring such allegations, the court in *Ryan* assumed, based on the facts, that such individuals could not have approved backdated stock options without acting at least recklessly. The court charged the directors on the compensation committee who approved the option grants with knowledge of the date of the options as well as the date of the actual grant. *Ryan*, 918 A.2d at 355. The court in *Ryan* also assumed that by certifying that stock options were granted in conformance with the terms of the company's stock option plans when they in fact were not, the individuals making such representations effectively were lying to shareholders. *Id.* at 355–56. These assumptions were not without foundation. As here, the stock option plan in *Ryan* required the exercise price of a grant to be set at fair market value on the date of the grant, and identified the board or a committee designated by the board as administrators of its terms. *Id.* at 346. Accordingly, it is not a stretch to conclude that the compensation committee members who approved stock option grants that did not comply with the requirements of the shareholder-approved plan faced a substantial likelihood of liability for doing so. After all, it was those individuals whose very responsibility was to ensure that the grants were in compliance with the plan. The court in *Ryan* therefore reasonably rejected the directors' defense that they lacked knowledge of the backdating when they approved the grants, finding it reasonable to infer that if they in fact did not know, then, under the circumstances, where it was their duty to have such knowledge, they acted recklessly. This demand futility analysis was adopted by several other courts in the course of find-

---

**20.** It is for this reason that *Ryan* does not support a finding of interestedness based merely on board membership at the time allegedly manipulated options are approved. As in *Ryan*, in this case the company delegated responsibility for stock option granting to the Compensation Committee. Therefore, the Compensation Committee, not the board at large, is chargeable with knowledge of the Plans and of the contents of the grants it approves. Moreover, under Ohio law the board is entitled by statute to rely upon information presented to it by an authorized committee of the board. See Ohio Rev.Code § 1701.59(B)(3).

ing demand futility. *See Edmonds v. Getty*, 524 F.Supp.2d 1267, 1276–77 (W.D.Wash.2007) (finding that the members of the compensation committee faced a substantial likelihood of liability for their roles in approving backdated options); *Conrad v. Blank*, 940 A.2d 28, 40 (Del.Ch. 2007); *Winters v. Stemberg*, 529 F.Supp.2d 237, 248 (D.Mass.2008) (adopting findings on demand futility from *Conrad* because claims involved same corporation).

The courts that distinguished *Ryan* may have had valid bases for doing so. For instance, in *Verisign*, a majority of the demand board clearly had no involvement in the approval of the allegedly backdated options—six of the eleven members did not join the board until after the last backdated option was issued. *Verisign*, 531 F.Supp.2d at 1192–93. Application of *Ryan* to this case, however, is more complicated.

### b. Timeliness of Claims

■ One vital aspect of assessing the likelihood of liability faced by a director that approved manipulated stock options, not squarely addressed by any existing authority in the demand futility context, is whether the potential causes of action against an individual director are barred by applicable statutes of limitation. Plaintiffs argue that this is not appropriately considered in assessing demand futility, but the Court rejects this argument. None of the cases cited by Plaintiffs squarely addressed this point. The Court agrees with the statement by the court in *Verisign* that claims that were time-barred could not be used as a basis for alleging demand futility. 531 F.Supp.2d at 1192.

Moreover, as a matter of intuitive sense, the applicable statutes of limitations must be considered. The inquiry into demand futility is whether the individual board members faced a substantial likelihood of liability such that they were unable to consider a hypothetical demand. If, as a matter of law, based on the running of the applicable statute of limitation or repose, the individual faced no possibility of liability because any claims against the individual were time-barred, then surely the individual cannot be said to face a "substantial likelihood" of liability. Accordingly, it would be nonsensical to adopt Plaintiffs' contention that the application of statutes of limitation/repose is irrelevant for purposes of assessing demand futility.

The Court must, therefore, address the potential liability of individual directors relative to when they served on the Compensation Committee. Specifically, of the members of the Demand Board who served at various intervals on the Compensation Committee, only Bachman, Hendrix, and White served during 2002. (Compl. ¶ 138.) Defendant Griswold, a member of the Demand Board, served on the Compensation Committee with Bachman, Hendrix, and White from 1998 to 2001. (*Id.*) In addition, Defendant and Demand Board member Bartlett served on the Compensation Committee in 1995 and 1996.[21] (*Id.*) Thus, for instance, if potentially viable claims (i.e., claims not barred by statutes of limitation) date back only to 2002, then only Bachman, Hendrix, and White face a substantial likelihood of liability. With Keithley (rendered interested by his receipt of allegedly backdated options), this represents less than the requisite half of

---

21. For purposes of this analysis, the Court focuses on the potential liability of Griswold. Any claims against Griswold found to be time-barred also would be time-barred as asserted against Bartlett. Due to the timing of Griswold's Compensation Committee service, issues regarding timeliness present closer questions on the facts pertaining to Griswold than they do with respect to Bartlett, whose last alleged approval of backdated options occurred in 1996.

the Demand Board, and demand is not excused. If, however, claims that are not time-barred may be asserted against Griswold as well, Plaintiffs can establish that at least half of the Demand Board could not have considered a demand fairly, and thus demand was excused.

### i. Timeliness—Federal Claims

■ Defendants argue that Plaintiffs may not maintain claims under Section 10(b) and Rule 10b–5 that are based on events that occurred outside the statute of repose relevant to such claims. The statute of repose for securities fraud claims under § 10(b) and Rule 10b–5 is the earlier of two years following discovery of the facts constituting the violation or five years following the violation. 28 U.S.C. § 1658(b). Plaintiffs stated clearly that their claims under § 10(b) are brought under Rule 10b–5, subsections (a) and (c). Rule 10b–5 provides, in pertinent part, as follows:

It shall be unlawful for any person, directly or indirectly by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud

[...]

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. By contrast to a claim under Rule 10b–5(b), which seeks to impose liability based on material misrepresentations or omissions, claims under

10b–5(a) and (c) are based on the allegedly fraudulent scheme itself. In this case, the "scheme" alleged by Plaintiffs is the alleged backdating of stock options. "A claim under § 10(b) that is based upon the backdating itself accrues on the date the option grant was made." *In re Affiliated Computer Servs. Derivative Litig.*, 540 F.Supp.2d 695, 701 (N.D.Tex.2007) (citing *In re Ditech Networks, Inc. Derivative Litig.*, No. C 06–5157 JF, 2007 WL 2070300, at *7 (N.D.Cal. July 16, 2007)). Thus, the timeliness of Plaintiffs' 10b–5 claims is assessed from the date on which the allegedly backdated stock option was granted.

■ Applying the five-year statute of repose to Plaintiffs' 10b–5 claim, the Court concludes that only the options granted on July 23, 2002 are actionable. Accepting for purposes of this motion that Plaintiffs have adequately pleaded the backdating of the July 23, 2002 stock options, the Court concludes that, consistent with *Ryan*, the members of the Compensation Committee that approved those options (Bachman, Hendrix, and White) are subject to a substantial likelihood of liability for purposes of demand futility. Plaintiffs' federal securities claims, however, do not subject Griswold to a substantial likelihood of liability. Griswold was not a member of the Compensation Committee on July 23, 2002. The allegedly backdated stock options that Griswold approved as a member of the Compensation Committee from 1996 to 2001, the most recent of which was approved on July 24, 2001, are not actionable under Rule 10b–5 because such claims are time-barred.[22]

---

**22.** Plaintiffs' claims for control person liability under Section 20(a), which assert derivative liability for other violations of the Exchange Act, are subject to the same statute of repose as the Rule 10b–5 claims. *In re MBIA*

*Inc. Sec. Litig.*, No. 05 Civ. 03514(LLS), 2007 WL 473708, at *9 (S.D.N.Y. Feb. 14, 2007) (citations omitted). Accordingly, such claims against Griswold also are time-barred.

▮▮▮▮ Nor does Plaintiffs' § 14(a) claim subject Griswold (or any other Defendant) to a substantial likelihood of liability. In the Complaint, Plaintiffs allege that the Director Defendants violated Section 14(a) of the Exchange Act by participating in the issuance of materially false and misleading proxy statements. Plaintiffs' Section 14(a) claims are based on four allegedly misleading proxy statements filed by KEI, the last of which was filed on December 28, 2001. Defendants contend that these claims are time-barred as a matter of law. "The statute of limitations period governing Section 14(a) claims is one year from discovery or three years from the occurrence that gives rise to the complaint, whichever is shorter." *Virginia M. Damon Trust v. N. Country Fin. Corp.*, 325 F.Supp.2d 817, 823 (W.D.Mich. 2004) (citing *Westinghouse Elec. Corp. v. Franklin*, 993 F.2d 349, 353 (3d Cir.1993); *Ceres Partners v. GEL Assocs.*, 918 F.2d 349, 362–363 (2d Cir.1990)). SOX did not extend the statutes of limitations or repose for § 14(a) claims. *In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 197 (3d Cir.2007). The initial complaint in this case was filed on August 9, 2006, more than three years from the date of the last proxy statement on which Plaintiffs base their Section 14(a) claims. Accordingly, such claims are barred as untimely.[23] The Section 14(a) claims thus are of no assistance to Plaintiffs' demand excusal argument. Accordingly, Griswold faces liability, if at all, based solely on Plaintiffs' state law claims.

### ii. Timeliness—State Law Claims

▮▮▮▮ Defendants argue that Plaintiffs' state law claims also are time-barred with respect to Defendant Griswold. The state law claims against Griswold include causes of action for breach of fiduciary duty (Counts V & VII), waste of corporate assets (Count XI), and gross mismanagement (Count XII).[24] As Defendants point out, under Ohio law, corporate waste and gross mismanagement are ways in which fiduciary duty can be breached, not separate causes of action independent of a fiduciary breach.[25] *See Prodan v. Hemeyer*, 80 Ohio App.3d 735, 739–41, 610 N.E.2d 600 (8th Dist.1992) (addressing corporate waste as breach of fiduciary duty); *Geygan v. Queen City Grain Co.*, 71 Ohio App.3d 185, 191, 593 N.E.2d 328 (12th Dist.1991) (mismanagement). Thus, in order for Plaintiffs to establish that Griswold is subject to a substantial likelihood of liability for his conduct, Plaintiffs must show that the state law breach of fiduciary duty claims against him are not time-barred.

Defendants contend that the five-year statute of repose established by Ohio Blue Sky Law applies to all of Plaintiffs' state law claims, and therefore renders any of Griswold's conduct during his tenure on the Compensation Committee inactionable. According to Defendants, Ohio Rev.Code

---

**23.** Plaintiffs effectively concede this point by failing to address the Section 14(a) claims in their opposition.

**24.** Counts IV and X are asserted only against the Option Recipient Defendants, which subclass does not include Griswold. Count VII, against the Insider Selling Defendants, likewise does not include Griswold. Counts IX (accounting) and XIII (constructive trust) are remedies, not independent causes of action.

**25.** *See Ohio Drill & Tool Co. v. Johnson*, 625 F.2d 738, 742 (6th Cir.1980) ("[D]irectors of a corporation occupy a fiduciary relationship to the corporation and its shareholders and are held strictly accountable and liable if the corporate funds or property are wasted or mismanaged due to the inattention to their duties of their trust.")

§ 1707.43(B) applies. That section provides that

> No action for the recovery of the purchase price as provided for in this section, and no other action for any recovery based upon or arising out of a sale or contract for sale made in violation of Chapter 1707 of the Revised Code, shall be brought more than two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the person or director were unlawful, or more than five years from the date of such sale or contract for sale, whichever is the shorter period.

Ohio Rev.Code § 1707.43(B).

Plaintiffs counter that they have not asserted any claims under Ohio Blue Sky laws, and therefore the statute of repose contained in § 1707.43(B) is inapplicable.[26] Instead, according to Plaintiffs, their state law claims are subject to a four-year statute of limitations with a discovery rule, and therefore are timely. Defendants respond by arguing that the determination of the applicable statute of repose does not turn on the label applied to a particular cause of action. Rather, under Ohio law, "courts must look to the actual nature or subject matter of the case, rather than to the form in which the action is pleaded. The grounds for bringing the action are the determinative factors [;] the form is immaterial." *Lawyers Coop. Publ'g Co. v. Muething*, 65 Ohio St.3d 273, 277–78, 603 N.E.2d 969 (1992) (citing *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984)). According to Defendants, application of this principle leads to the conclusion that § 1707.43(B)'s five-year statute of repose applies to all of Plaintiffs' state law claims. In support of this position, Defendants cite two cases: *Wuliger v. Anstaett*, 363 F.Supp.2d 917 (N.D.Ohio 2005); and *Rogers v. Isler*, No. 2:03–cv–1192, 2005 WL 3776350 (S.D.Ohio June 20, 2005).

*Anstaett*[27] involved claims by a federally-appointed receiver against a salesman of viatical settlement investments. The receiver asserted numerous federal securities claims, including violations of the Exchange Act, as well as several claims arising under Ohio state law, including common law fraud, fraud in the inducement, breach of contract, unjust enrichment, breach of fiduciary duty, and intentional or negligent misrepresentation. *Anstaett*, 363 F.Supp.2d at 920. The district court concluded that all of the plaintiff's state law claims arose from the sale of securities, and therefore were subject to the provisions of § 1707.43. *Id.* at 935. The court in *Anstaett* reasoned that "Ohio courts have been fairly consistent in their

---

**26.** Plaintiffs also argue that the claims nevertheless are timely even if § 1707.43 applies. This contention is, as Defendants point out, incorrect. Plaintiffs' argument misapprehends the effect of a statute of repose as distinguished from a statute of limitation. Plaintiffs argue that § 1707.43 contains a two-year statute of limitation subject to a rule of discovery, and because Plaintiffs could not have known of the conduct underlying their claims until March 2006, and filed this action in 2006, it is timely. But Plaintiffs ignore the repose aspect of § 1707.43, which provides a two-year statute of limitations with a discovery rule, or a five-year statute of repose, whichever is shorter. The statute of repose,

as applied to the conduct at issue, (specifically the approval of the July 24, 2001 stock option grant, which was approved by the Compensation Committee which included Griswold), expired on July 24, 2006. This action was commenced on August 9, 2006, and therefore claims based on the stock options granted on July 24, 2001 are barred by the statute of repose.

**27.** The Court refers to this case by the defendant's name because a number of decisions exist which arose out of the same set of facts involving viatical settlements and bear the name of the receiver, Wuliger.

approach in finding that the shorter statute of limitations under § 1707.43 is applicable to actions arising from sales of or contracts relating to securities." *Id.* at 934. The court approvingly cited the analysis of the Ohio court of appeals in *Lynch v. Dean Witter Reynolds, Inc.*, 134 Ohio App.3d 668, 731 N.E.2d 1205 (1999). The court in *Lynch* applied the principle of statutory construction that specific provisions prevail over conflicting general provisions unless the legislature expressed an intention to the contrary, and concluded that claims that could be characterized both as violations of Ohio Blue Sky law and as breaches of contract were subject to the more specific limitation provisions of § 1707.43. *Anstaett*, 363 F.Supp.2d at 934 (citing *Lynch*, 134 Ohio App.3d at 671, 731 N.E.2d 1205).

*Rogers* was very similar to *Anstaett*, and expressly followed its reasoning. *Rogers* involved federal securities claims under Sections 10(b) and 20(a) of the Exchange Act, state securities law claims under Ohio, Florida, and Missouri securities laws, and common law claims for fraud, breach of fiduciary duty, and negligent supervision.[28] The plaintiffs' initial complaint, which asserted only the federal and state securities law claims, was determined to be time-barred. *Rogers*, 2005 WL 3776350, at *1. The plaintiffs then sought leave to file an amended complaint, which reasserted the same securities claims earlier found to be barred, as well as the additional common law claims. The plaintiffs argued that the common law claims were subject to the four-year statute of limitations set forth in Ohio Rev.Code § 2305.09, while the defendants asserted that those claims were subject to § 1707.43(B) governing claims arising out of violations of Ohio Blue Sky laws.

Following *Anstaett,* the court in *Rogers* agreed with the defendants and held that the plaintiffs' claims for common law fraud, breach of fiduciary duty, and negligent supervision were subject to the statute of limitations established in § 1707.43(B). *Id.* at *6.

Plaintiffs contend that *Anstaett* is distinguishable on several grounds. First, Plaintiffs contend that this action does not involve the sale of securities, and therefore the Ohio Blue Sky provisions do not apply. Second, Plaintiffs argue that the claims in *Anstaett* were asserted by purchasers of securities, and are therefore distinguishable because Plaintiffs in this case bring claims on behalf of the company, which was the seller, not the purchaser. Third, Plaintiffs assert that *Anstaett* is distinguishable because it involved claims by shareholders against a company, whereas this case is a derivative action, asserting claims possessed by the company itself. Finally, Plaintiffs contend that if § 1707.43 applies, the state law claims nevertheless are timely because they are subject to a discovery rule, and Plaintiffs had no reason to know of the alleged misconduct prior to March 2006.

Of the bases for distinguishing *Anstaett* offered by Plaintiffs, only one has any merit. Plaintiffs argue that this case differs from *Anstaett* because the claims in that case were asserted by the purchasers of the securities, and Plaintiffs' claims herein are brought on behalf of the company, which was the seller of the security, not the purchaser. Although Plaintiffs fail to provide any, there is support for this position. In *Baker v. Pfeifer*, individual investors in oil and gas wells brought suit against the well operators, and the individuals who served as the officers, directors,

---

**28.** One difference between *Rogers* and *Anstaett* (and the instant case) is that the *Rogers* plaintiffs expressly pleaded claims for viola-

tions of Ohio state securities laws. That is not the case here, and was not the case in *Anstaett*.

and shareholders of the operators. 940 F.Supp. 1168 (S.D.Ohio 1996). The complaint asserted seventeen causes of action, including federal securities law violations, federal RICO violations, and a plethora of Ohio common law claims, including breach of contract, fraud, and breach of fiduciary duty. 940 F.Supp. at 1173 n. 2. The plaintiffs claimed, *inter alia*, that the defendants defrauded them by intentionally causing the wells to underproduce in order to induce the plaintiffs to reassign their interests in the wells to the defendants. *Id.* at 1172. The defendants argued that the Ohio Blue Sky law statute of limitation set forth in § 1707.43 applied to the plaintiffs' claims for breach of contract, breach of fiduciary duty, and fraud because all those claims arose from the sale of securities. *Id.* at 1182. The plaintiffs countered by arguing that § 1707.43 applied only to claims asserted by purchasers of securities, not by sellers, and therefore did not bar the plaintiffs' claims. *Id.* The court in *Baker* adopted the plaintiffs' argument and held § 1707.43 inapplicable to claims by purportedly defrauded sellers of securities. *Id.* The court noted that "the plain language of [§ 1707.43] emphasizes its role of protecting *purchasers* from fraudulent sales," noting that the title of the section is "Remedies of *purchaser* in unlawful sale." *Id.*

■ The Court agrees with the reasoning and the result in *Baker,* and finds that it applies equally in this case. Because Plaintiffs' claims are brought on behalf of the seller of the security, not the

purchaser, § 1707.43 does not apply. But, again, the analysis must go further. As the Court in *Baker* concluded, claims for breach of fiduciary duty are governed by § 2305.09, which provides a four-year statute of limitation. 940 F.Supp. at 1183 n. 19. This section, standing alone, does not rescue Plaintiffs' state law claims against Griswold. Those claims are time-barred unless subject to a discovery rule.

In support of their contention that the state law breach of fiduciary duty claims against Griswold are subject to a discovery rule, Plaintiffs cite two cases: *Nemeth v. Aced, Hobbs, Wassell and O'Connor,* No. 95APE06–768, 1996 WL 76319 (Ohio Ct. App. 10th Dist. Feb. 22, 1996); and *Estate of Schroer v. Stamco Supply, Inc.,* 19 Ohio App.3d 34, 482 N.E.2d 975 (1st Dist.1984). *Nemeth* is distinguishable on its face, because the lone assignment of error was whether the trial court erred in granting summary judgment on the plaintiff's fraud claim. 1996 WL 76319, at *2. The court in *Nemeth* did not discuss the potential application of the discovery rule to breach of fiduciary duty claims, and therefore it has no bearing on the instant case, as Plaintiffs do not assert common law fraud claims in this action.[29]

■ *Estate of Schroer,* which clearly would support application of the discovery rule to breach of fiduciary duty claims, is no longer good law.[30] The statute of limitations is codified, and the statute expressly identifies certain claims as subject to the discovery rule. *See* Ohio Rev.Code § 2305.09.[31] Breach of fiduciary duty is not

**29.** The defendants in *Nemeth* cross-appealed, arguing that the trial court erred in failing to find the plaintiff's fraud claim barred by the statute of limitation. The court in *Nemeth* sustained the plaintiff's assignment of error and overruled the defendants' assignment, holding that fraud claims were subject to the discovery rule expressly set forth in § 2305.09(D), and the plaintiff's claims there-

fore were not time-barred. 1996 WL 76319, at *5.

**30.** The Court need not decide whether *Estate of Schroer* was decided correctly at the time it was issued.

**31.** Ohio Rev.Code § 2305.09 applies a discovery rule to the statute of limitations under the following circumstances: "If the action is for

so identified. Thus, the general rule is clear that the discovery rule does not apply to claims arising out of a breach of fiduciary duty. *Jim Brown Chevrolet, Inc. v. S.R. Snodgrass, A.C.*, 141 Ohio App.3d 583, 587, 752 N.E.2d 335 (11th Dist.2001); *Kondrat v. Morris*, 118 Ohio App.3d 198, 207, 692 N.E.2d 246 (8th Dist.1997); *Herbert v. Banc One Brokerage Corp.*, 93 Ohio App.3d 271, 275, 638 N.E.2d 161 (1st Dist. 1994). As discussed by the Sixth Circuit in *Bell v. Bell*, 132 F.3d 32 (6th Cir. Dec. 3, 1997) (table), in *Investors REIT One*, the Ohio Supreme Court rejected the holding of *Estate of Schroer* with regard to application of the discovery rule to claims not expressly enumerated by statute. *Bell*, 132 F.3d 32, at *7 (citing *Investors REIT One v. Jacobs*, 46 Ohio St.3d 176, 546 N.E.2d 206 (1989)). In *Investors REIT One*, the Ohio Supreme Court was presented with an opportunity to extend the discovery rule to actions that fell outside the scope of the express discovery rule provision of § 2305.09(D), but the court declined to do so. The court in *Investors REIT One* reasoned that the legislature's failure to include certain claims as subject to the discovery rule evidenced its intention to exclude such causes of action not expressly enumerated. 46 Ohio St.3d at 182, 546 N.E.2d 206. Following the Ohio Supreme Court's reasoning in *Investors REIT One*, the Sixth Circuit in *Bell* rejected an argument by the plaintiff that the discovery rule applied to a claim for breach of fiduciary duty and also acknowledged the overruling of *Estate of Schroer*. 132 F.3d 32, at *7. Thus, on the basis of Ohio Rev. Code § 2305.09, the Sixth Circuit's decision in *Bell*, the Ohio Supreme Court's decision in *Investors REIT One*, as well as a number of decisions by Ohio intermediate appellate courts, this Court concludes

that Plaintiffs' state law claims for breach of fiduciary duty are subject to the four-year statute of limitations set forth in § 2305.09, and are not subject to the discovery rule. Accordingly, the state law claims against Griswold based upon his approval of allegedly backdated options as a member of the Compensation Committee from 1996 to 2001, are time-barred. Griswold is not subject to a substantial likelihood of liability, and therefore could have considered a demand properly, had one been made.

■ Plaintiffs have raised a reasonable doubt regarding the interestedness of four KEI directors: Keithley, by virtue of his receipt of allegedly backdated options, and Bachman, Hendrix, and White by virtue of their service on the Compensation Committee when it approved the issuance of the allegedly backdated options on July 23, 2002. However, the remaining six directors on the Demand Board (Defendants Bartlett, Griswold, and Reddy, and nonparties Jackman, Saponas, and Scherer) are not subject to a substantial likelihood of liability, and therefore are not deemed interested. Thus, a majority of the Demand Board properly could have considered a demand. However, no demand was made, and Plaintiffs have failed to establish that the demand requirement should be excused.

### III. Conclusion

Plaintiffs have not stated particularized allegations establishing a reasonable doubt as to the independence or disinterestedness of a majority of the Demand Board. Accordingly, Plaintiffs have failed to show that demand is excused. The motions to dismiss filed by the Individual Defendants

---

trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until

the wrongdoer is discovered; nor, if it is for fraud, until the fraud is discovered."

(Doc. No. 28) and the nominal defendant KEI (Doc. No. 32) are hereby **GRANTED.** Pursuant to the request of Plaintiffs' counsel at oral argument, the Court grants leave to amend. However, leave to amend is limited to Plaintiffs' assertion of new facts, to the extent any such facts are known to Plaintiffs and can be alleged in good faith, which would allow the assertion of claims against a member of the Demand Board that are not time-barred under the Court's analysis and would arguably lead to a substantial likelihood of liability on the part of the director so implicated. Any amendment shall be filed within thirty days of the entry of this order. If no amendment is filed by the conclusion of the thirty-day period, the Court will enter a Rule 54 final judgment based hereon. Until final judgment is entered, this order is not appealable.

**IT IS SO ORDERED.**